OSBORNE, Jr., *v.* BOARD OF COUNTY COMMISSIONERS OF ADAMS COUNTY.

*(Circuit Court, D. Nebraska. ——, 1881.)*

1. ELECTION PRECINCT—NEBRASKA.

   An election precinct has no corporate existence, and can neither sue nor be sued under the laws of this state.

2. MANDAMUS—JUDGMENT.

   A *mandamus* cannot properly issue out of the federal courts until after a claim in dispute has been reduced to judgment.

3. COUNTY—PRECINCT BONDS.

   A suit can be maintained against a county to enforce the payment of a bond voted by and issued for a precinct to aid in works of internal improvements, when such bonds are authorized by law.

4. PRECINCT BONDS—GRIST MILL—NEBRASKA.

   There is no law in this state that authorizes the precincts to vote, or the county commissioners to issue bonds for and on behalf of a precinct, for the purpose of aiding in the erection and construction of a steam grist-mill, and bonds issued therefor are simply void.

Demurrer to Petition. Suit on coupons detached from precinct bonds issued to aid in the erection and construction of a steam grist-mill.

*A. H. Bowen,* for plaintiff.

*John M. Ragan,* for defendant.

DUNDY, D. J.   This suit is based upon 122 coupons, each
for the sum of $25, which were detached from a series of
bonds of $500 each, voted by the people of Juniata precinct,
and issued for and on behalf of said precinct by the county
commissioners of Adams county, to aid in the erection of a
steam grist-mill.   It is shown by the petition that on the
twenty-sixth day of November, 1872, an election was held in
said precinct, at which time bonds to the amount of $6,000
were voted, and that on the same day bonds were issued in
that sum for the purpose aforesaid; that the bonds and cou-
pons were purchased by the plaintiff before due, without
notice, and for a valuable consideration, and that the same
are wholly unpaid.

The defendant demurs to the petition, and two important
questions are presented for consideration by the demurrer:
*First.* Has the court jurisdiction to hear and determine the
matter in dispute between the parties? and, *second,* do the
facts stated in the petition constitute a cause of action, and
justify a recovery against the defendant; or, rather, against
the precinct represented by the defendant?

The defendant has not seen proper to state just why the
court is without jurisdiction in the premises, but I conclude
that it is because of the supposed want of authority to pro-
ceed against a county to enforce the payment of a bond issued
on behalf of a precinct.   It is clear enough that the laws of
this state authorize the qualified voters of an election precinct
to vote for the issuing of bonds for specified purposes, and
when properly voted they are to be issued by the county
commissioners of the county in which the precinct may be
situated.   It is equally clear that an election precinct, formed
under the laws of this state, has no corporate existence.   Such
a political subdivision is formed for mere convenience of vot-
ing.   It cannot sue or be sued, because it has no officers of
its own to prosecute or defend a suit.   The supreme court
of this state has given an authoritative exposition of the law
upon this subject, and that must be deemed conclusive until
otherwise decided by the highest judicial tribunal in the land.
This court, too, at the present term, has held the law to be

as here stated. *Blair* v. *West Point Precinct,* U. S. C. C. Neb.;* *Chandler* v. *Dodge Co.* 10 Neb. 20.

As a general rule, when and where a right exists, the law furnishes an adequate remedy to enforce the same when it is in any way impaired or impeded. It is conceded that precinct bonds may be lawfully issued for some purposes. If that be true, it necessarily follows that a remedy must exist to enforce the payment thereof; and, if the precinct itself cannot be sued, though primarily liable for the payment of the bond, then reason, it would seem, must point directly to the officers who execute the bonds as the ones who must respond on behalf of the precinct. And more especially is this so where a *mandamus* cannot be issued until after a proper suit has been instituted and the claim reduced to judgment, as seems to be required by all the federal courts. Indeed, whatever may be thought or said of the propriety of sustaining an action against a county to enforce payment of a precinct bond, the question must be regarded as no longer open to argument in this court. Ever since the decision of the case of *Chandler* v. *County Com'rs Dodge Co.,* brought in this court, the right to sue a county, to recover on a precinct bond, has been sanctioned and upheld. This case went to the supreme court, where the judgment was affirmed, though the question here under consideration was not raised in the supreme court. The case of *Blair* v. *West Point Precinct,* before referred to, is authority on this point.

The demurrer draws in question the validity of a precinct bond issued to aid in the erection and construction of a steam grist-mill, and if the bonds from which the coupons in suit were detached cannot be upheld under the provisions of the "Internal Improvement Law" of the fifteenth of February, 1869, then the bonds must fall, and this suit with them. There is no other law, or part thereof, conferring the right on electors of a precinct to vote bonds for any purpose. Section 1 and section 7 of this act are as follows:

"Section 1. That any county or city in the state of Nebraska is hereby authorized to issue bonds to aid in the construction of any railroad or

* See this case reported in 5 FED. REP. 265.

other work of internal improvement, to an amount to be determined by the county commissioners of such county, or city council of such city, not exceeding 10 per cent. of the assessed valuation of all taxable property in said county or city: *provided*, the county commissioners or city council shall first submit the question of the issuing said bonds to a vote of the legal voters of said county or city, in the manner provided by chapter 9 of the Revised Statutes of the state of Nebraska for submitting to the people of a county the question of borrowing money."

"Section 7. Any precinct in any organized county of this state shall have the privilege of voting to aid works of internal improvement, and be entitled to all the privileges conferred upon counties and cities by the provisions of this act; and in such cases the precinct election shall be governed in the same manner as is provided in this act, so far as the same is applicable, and the county commissioners shall issue special bonds for such precinct, and the tax to pay the same shall be levied upon the property within the bounds of such precinct. Such precinct bonds shall be the same as other bonds, but shall contain a statement showing the special nature of such bonds."

The language here employed to confer the authority is, "to aid in the construction of any railroad, or other work of internal improvement." Is a steam-mill a work of internal improvement within the meaning of the law above quoted? The first section of the act referred to specially describes railroads, and then uses the general term or phrase, "or other works of internal improvement." There is a long line of authorities which seem to settle very effectually this doctrine, to-wit: That where a law or written instrument is couched in specific and definite language, and special authority is conferred for doing particular things, and then a general authority is thereinafter given, the general authority so conferred must be held to relate to matters similar to the ones specially described. Applying the principle here stated to the construction of the law under which the bonds were voted, all reasonable doubts of their validity will at once cease. It would then be equivalent to saying that bonds may be voted to aid in building railroads and other works, or internal improvements of a similar nature. This would, perhaps, authorize the voting of bonds to aid in the construction of canals, bridges, and wagon roads, as well as railroads. All these objects would facilitate the transportation of persons and property from place to place, and would promote the great objects had in view by the legisla-

ture when the said law was enacted.   In giving the law this construction we do no violence to language or principle.   So far as known, no court in this state has gone beyond the principle of construction here applied.   It has been held in several cases that the right to erect public buildings, such as jails and court-houses, derives no support from the law before cited.   See *U. P. R.* v. *Lincoln Co.* 3 Dill. 300; *Dawson Co.* v. *McNamar*, 10 Neb. 276; *Lewis* v. *Sherman Co.*, decided at the present term of court.*   And this seems to be the settled law in this state.   Yet in some of the authorities outside of the state, court-houses and jails are held to be "internal improvements" to which public aid may be voted under laws similar to our own.   But the statute law, in every case where the voting of bonds is specially authorized, is essentially different from the one under consideration.   But it is claimed that the case of *Township of Burlington* v. *Beasley*, 94 U. S. 310, decided by the supreme court of the United States, is also decisive of the controversy involved in this suit.   I think otherwise.   Applying the same principle to both cases, we would arrive at the same conclusion reached in either.   The case last referred to originated under the internal improvement law of the state of Kansas.   That law especially authorizes "counties, incorporated cities, and municipal townships to issue bonds for the purpose of building bridges, aiding in the construction of railroads, water-power, and other works of internal improvement."   The Kansas law is much more comprehensive and liberal than the law of this state.   It authorizes the voting of aid for specific purposes where our law is silent.   It confers ample authority for certain purposes, while our law withholds it.

Authority is given to aid in developing water-power in Kansas, but in this state the legislature has withheld the right so to do.   And, so far as known, no one has, until recently, seriously claimed that such a doubtful authority could be rightfully exercised under the provisions of existing law.

If the law in this state, as in Kansas, had authorized the voting of bonds to aid in developing water-power and build-

*See this case fully reported in 5 FED. REP. 269.

ing grist-mills, for the purpose of supplying the public with food, then there would be no good reason why aid could not also be voted to a steam grist-mill. To develop the water-power would simply be to furnish the motive power to do the business in question. The object to be gained in such case is to furnish facilities for grinding grain for the use and benefit of the interested public. This being true, there would seem to be no good reason why aid could not be voted, under the Kansas law, to aid in the erection of a steam grist-mill. The object to be gained would be precisely the same in either case; that is, the furnishing of motive power to propel the necessary machinery would accomplish the identical purpose and produce the same result. And I apprehend it is because of this reason, the similarity of results, that brought about the decision in the Kansas case. Thus, bonds could be voted to develop the water-power for the purpose stated. This authority is given in express terms. "Other works of internal improvement," in the language of the law, may all receive public aid. A water grist-mill and a steam grist-mill are similar in many respects; in fact, in almost every respect except in the motive power. Both are operated for the same purpose, and both accomplish the same results. So, when a water-mill can be aided under the specific clause in the law, a steam-mill may be aided under the general clause giving the right to aid "other works of internal improvement," for the manifest reason that it, the steam-mill, is similar to the water-mill specially authorized, and falls within the principle of construction hereinbefore stated. There is, then, no inconsistency between the decision of the supreme court in the Kansas case, and the conclusions reached in the present case.

The demurrer must be sustained.

I am authorized to say that Judge McCrary concurs in this judgment.